The first case for argument is United States et al v. Daikin Applied Americas et al. Mr. Rogers, if you wish to proceed, you may. Good morning. May it please the court. Counsel, my name is Charles Rogers. I'm arguing today on behalf of Appellants Daikin Applied Americas and Super Radiator Coils LP. With me at counsel is Nancy Burke, who represents Super Radiator Coils. Appellants for some time have been involved in the investigation and remediation of a site at 6714 Walker, about 1,400 feet down gradient from the Rally Tire Superfund site. In 2020, they moved the lower federal district court in Minnesota to intervene in the Rally Tire proceedings for the purpose of opposing entry of an amended consent decree. The lower court failed to grant the motion to intervene, arguing that there is no conceivable manner in which the interveners could be harmed or face the risk of injury as a result of entry of that amended consent decree. On de novo review, we ask this court to carefully review the record, reverse the lower court, and remand this case for proceedings in accordance with your order. The standard for Article III standing or intervention basically runs around parallel path. The key issue for resolution is, is there an injury? With an injury, causation and redressability and impairment of an interest necessarily follow. So with regard to this case, of course, on de novo review, we ask the court to assume as true all factual assertions made by the interveners appellants, and to draw inferences in favor of the appellants for purposes of reviewing standing and intervention. We're also mindful of national parks and the notion that financial harm is indeed injury in fact. Here, there are four fundamental ways in which the lower court erred in reviewing the change from the consent decree to the amended consent decree. First, the lower court determined that when with regard to the amended consent decree, when it absolved EPA of any obligation to nothing had changed because the lower court determined that the underlying consent decree did not address solvents and degreasers. That's an error. If you look at the appendix page 31 through 33, the CD's purpose is expressly to protect human health and the environment from releases or threatened releases of chemical substances, a defined term, at, on, or from the Rally Tar site. Chemical substances are defined on page 26 of the appendix, specifically to include solvents and degreasers. Is that the only place where solvents and degreasers are mentioned in the 86 plan, in the definitions? In the definition, yes, and then the terms chemical substances is used throughout the consent decree, embodying then the term solvents and degreasers. And it's not contested, your honor, that solvents and degreasers degrade into chlorinated volatile organic compounds, CVOCs. The very substance that Dr. Mindy Han, with a PhD from John Hopkins University, an environmental engineer, she's testified that Rally Tar is responsible for the release of CVOCs that are migrating 1,400 feet to the 6714 Walker, thereby complicating an increase in the cost of that cleanup. That's fundamentally the question here. EPA denies that the original consent decree addressed that issue, or that they took any action with regard to CVOCs, but that's incorrect. Clearly, if we look at the record, if you look at page seven of our reply brief, we note that periodically throughout the period of this time, through at least through 2015, EPA was regularly testing for the existence of CVOCs and located CVOCs, a byproduct of solvents and degreasers, in all four aquifers underneath the site. Very importantly, if you look at the reply brief page 15, in 2016, in the five-year review for the Rally Tar site, the EPA determined that there was a plume of CVOCs underneath the site, and they determined that it was likely that the remediation at that site, which is a pump-and-treat remediation, would have to be optimized in order to address that contamination. With the amended consent decree, what happened? There's no longer any reference to any solvents and degreasers, and there's no longer pump-and-treat requirement. How does that harm the intervener's interest? Quite specifically, in two manners. Number one, Dr. Hahn testified that means that there's an increase in the number, in the amount, migration of CVOCs from Rally Tar to 6714 Walker, thereby increasing the cost and complexity of the cleanup. And number two, Aaron Benker, the environmental consultant responsible for the cleanup at 6714 testified that because of the EPA saying, we're not responsible for solvents and degreasers at Rally Tar, the MPCA, Minnesota Pollution Control Agency, they're partly responsible for overseeing 6714, has said, no, Rally Tar is not responsible. You're fully responsible for all, if any, CVOCs that are present at that site, thereby increasing the cost and causing direct injury. So let's look at the the interest here. Under the pump-and-treat remedy, in the consent decree, it was robust. Over 100 million, or over 200 million gallons each year had to be pumped and treated out of three aquifers underneath the site. And that provided two remedies. Number one, it degraded any constituents that were in that contaminated water, including CVOCs. And number two, it inhibited the migration off-site of CVOCs to 6714 Walker. Now, as I understand the APLE's position of this, they're saying that the decree really doesn't change that pump-and-treat requirement, in that there was always the option to ask that it be discontinued if the science supported it, and that that's all they're doing in the amendment. Absolutely, Judge Moye. But the They had to determine that there was no source that needed to be remedied anymore. They had to determine that migration of contaminants off-site was no longer a problem that had to be addressed. They had to provide for public notice under 40 CFR 300.435, so that there could be public comment on a change of the remedy that's so drastic. They claim that's still in the amended decree, as I understand their argument. It is not. In the amended consent decree, take a look at pages 307, 308, and 308 of the appendix. There's now this thing called a pilot cessation program, so that in an interim basis or a permanent basis, they could turn off the pump-and-treat system. Judge Magnus in the lower court said, well, it's speculative to presume that they'd do so, but they did do so. Mr. Fiomi, the project manager for EPA, testified. If you look at the appendix 535, he admits that under the pilot cessation program, all of the pump-and-treat wells for the drift, the Platteville, and the St. Peter Aquifer have been turned off. St. Louis Park, the party responsible for the remediation at Rally Tar, admits in its website that the pump-and-treat system is no longer the remedy, and they're going with natural attenuation. Let nature take its course. So how is that harmed? The intervener's appellants? Most directly, it harms their interests by virtue of the fact that there's now no inhibitor of the migration or no treatment of CVOCs that, according to Dr. Hahn, are continuing to migrate to our site, thereby increasing the complexity of the cleanup and the cost of the cleanup. Number three, W23, is a deep multi-aquifer well that proceeds down to the Prairie du Chien aquifer, which is a deep drinking water aquifer. Dr. Hahn testifies that that well is still leaking, causing contamination directly to the Prairie du Chien aquifer that flows underneath 6714 Walker, increasing the complexity and cost of the cleanup. Under the original consent decree, W23 was required to be repaired, and some repairs were affected. However, according to Dr. Hahn, those repairs were not adequate. It's still leaking. It's still causing contamination. Under the amended consent decree, only multi-aquifer wells that weren't previously investigated are required to be looked at, and EPA clearly doesn't intend to do anything with that well. On page 25 of their brief, if you look at it, they deny that the well was leaking. They say there's no problem. We're not going to, so clearly they're not going to do anything. Again, the failure to address that well causes harm rather directly. Then we have the fourth avenue of problems. If you look at Union Electric, contribution protection. For the first time under the amended consent decree, contribution protection was provided. Under the original consent decree, there was no contribution protection. Obviously, if our right at 6714 to go after and to seek contribution from the remediating parties at Raleigh Towers impacted, that's a real harm that would give rise to standing or intervention. Here, the risk is very real because the matters addressed under that contribution protection clause involve all response actions taken or to be taken and all response costs incurred or to be incurred at or in connection with the Raleigh Towers site by the United States or any other person. So, if the court agrees with us. Let me ask you this. Sure. Because I understand the Appalachian breeze. The city and EPA both say, in essence, that whatever contribution rights you had pre-amendment survived the amendment. If the order or decision specifically said that, would that solve the problem? Well, if the order said that, that would go a long way. Certainly, I think that might well address it. It depends on what it says, of course. The judge determined that judicial estoppel applied and that's an error because St. Louis Park and the state of Minnesota, I don't believe, neither one of those parties stipulated to any such thing that this wasn't a matter addressed. A stipulation, if provided today, by all of the parties on the other side of the aisle, who I respect very greatly, if they tell you that there is absolutely off-site migration of contaminants from Raleigh Tower is not a matter addressed or adjudicated in a Raleigh Tower proceeding and use of order, then the contribution clause is no longer a problem. Well, I mean, there's a difference between saying that they're liable and saying that whatever rights you had pre-amendment survived the amendment. I'm not asking them to say they're liable. I'm just asking them to say the contribution clause doesn't apply to any of our right to pursue a claim for contribution if we were able to prove one. That's all we're asking and we'd ask the court order to adopt that too. I'll save the rest of my time for rebuttal. Thank you very much. Thank you. All right. Ms. Shugart-Schmidt, I believe that you have 12 minutes. You may. Good morning, Your Honors, and may it please the court, Caitlin Shugart-Schmidt here on behalf of the United States. With me at council's table is David Zall, counsel for the City of St. Louis Park, who will be taking three minutes of time. Your Honors, we're here this morning to ensure that the critical cleanup work that's been occurring at the Raleigh Tower site for the past 35 or so years continues uninterrupted because the prospective intervenors appellants here are neither injured by the entrance of the amended consent decree, because any interest that they do have is paralleled by the United States, and because after 30-plus years of overseeing the site, Judge Magnuson made a reasoned and supported decision that the amended consent decree was in the interest and protective of public health and the environment. His decision should be affirmed. Unless you'd prefer otherwise, I'll start with a contribution protection provision issue because I think that in some ways is the core of the case, and then move on to the sort of scientific disputes about the way that the site operates and what the consent decree covers. So as Your Honors noted, the contribution protection provision and the interpretation of that, the interpretation is consistent between the city, the United States, and to the degree that appellants have an interest in it is consistent with their position as well. I think that's clear from the briefs. It was clear in the district court and the city today is happy to answer any specific questions you might have about their interpretation, which they believe has been fairly consistent throughout this process. And I think the appellants cannot be injured by the entrance of the amended consent decree because it does not change anything with respect to their possible contribution rights were it to be shown in some sort of future evidentiary proceeding that contamination was migrating off the Reilly Tarr site and onto the Walker site. The second thing I think that's important to note here is that there is a reason why the United States has resisted any call to change the language of the amended consent decree or to try and add some sort of additional specificity for the benefit of appellants in this particular case in this litigation. And that's because this is model language. The goal of CERCLA and these settlement negotiations is to ensure that parties are willing to come to the table and work to clean up these sites. It's difficult. It's expensive. And the more uncertainty we inject in that process by making it seem like one party needed to have extra language added in order to protect their rights opens the door to other parties in the future thinking that they need to come in and intervene at sites in order to ensure their consent decree. We would urge no changes be made that would make that seem prudent in the future. So from there, I would move on to the claims that the appellants are making regarding injury related to the spread, alleged spread of contamination. EPA certainly does not agree with the factual allegations that have been put forth regarding the spread of contamination, but for the purposes of this proceeding understands that we are going to take those as true. Regarding the supposed elimination of the treatment of chlorinated solvents under the amended consent decree, I think text and historic practice make crystal clear that chlorinated solvents were not the reason why Reilly Tarr is a Superfund site. They weren't in the mid-1980s and they still are not today. The problem with the Reilly Tarr site was the 6,000 or so gallons of distillation byproducts from the treatment plant that were poured into the environment on a weekly basis for something like half a century, and those PAHs and related contaminants are what were treated at the time of the consent decree's first entrance and are what are still being treated today. I think it's clear that when you look at every criteria related to monitoring, related to the cessation of the consent decree, every one of those criteria relate to PAHs. They don't relate in any form to solvents and degreasers or CVOCs or any of those other chemicals. And I want to be clear that's not to say that EPA isn't concerned about other possible chemical contamination. I think this is true for the city and state as well, that EPA and the state have continually monitored for chemicals because we are concerned about the safety of drinking water and contamination in groundwater. And in fact, there is an entirely separate Superfund site upon request of the state, the Highway 100 project, which entirely focuses on this greater non-site-specific plume of CVOCs that we're seeing in the area. So the fact that CVOCs are not present in the Reilly-Tarr consent decree originally or as amended certainly does not mean that there's been any abdication of duty regarding paying attention to those chemicals and ensuring that they're being treated. But the underlying point is that the amended consent decree doesn't change in any way requirements that were put in in the consent decree for the treatment of CVOCs or related chemicals. The second point that I'd like to make is regarding the cessation or the pilot test and the perhaps future cessation of water pumping at the site. The first thing I'd like to say is that the water pumping is not a goal in and on itself, right? The goal of all of these systems put in place at the site is ultimately to ensure that drinking water is protected by ensuring good quality groundwater. So throughout this whole process and in the record, I think there are indications that in the 1990s there have been changes and updates to the way in which this program has been run. And it's because, you know, this system evolves over time as we understand better the way that contaminants flow, we see what's in the groundwater at any particular moment in time. And under the original consent decree, the parties agreed that it was worth considering and finding out whether or not the current pump and treat system was effective or whether modifications could be made, you know, and that was the point of the pumping test project that was done. That project has now concluded. The parties are considering what the results showed, but there is certainly absolutely no indication that tomorrow we would all wake up and under the amended consent decree someone would just say, great, we're done with pumping, we're going to call it good. There are clear requirements that are protective of public health that we have to ensure are met before we can change or modify any particular program. Why shouldn't they can, however, be allowed to at least come in and show that you're wrong? Well, I think because they're not showing that there's any particular injury to them from the entrance of the amended consent decree specifically. Do you think the evidence is conclusive that there is no migration from one site to the other? I think that that's unfortunately not really what's presented in this case, because we have to take their evidence as true that there might be some migration. But even if that's true, I think the question is whether or not it's the entrance of the amended consent decree specifically that harms the appellants. And because there's no real change in the program that's being run at the Reilly-Tarr site in a way that would impact the interests of appellants, they don't have a right to intervene. They're not injured by the amended consent decree. Well, as I understand, the gravamen of the dispute is that they claim there's at least a potential and claim they have expert testimony that would substantiate their allegation that the migration of harmful chemicals that they would have to clean up will increase as a result of the amendment. Why is that allegation, you may disagree with it, but why is that taking the facts and the like most favorable to the intervener not enough to get them into court to at least give them a chance to prove that? Sure. I think because what they actually can't show, the part of that they can't show is the end. They can't show that it's the entrance of the amended consent decree specifically that would cause this increased migration of chemicals that would injure them. Because the amended consent decree doesn't change anything with respect to the consent decree and what's already being done. And it's absolutely true that they may want a different version of the amended consent decree, but they're not parties to the Reilly-Tarr site. I mean, they'd be welcome to be. They could come in, accept liability, and help us do some cleanup at the site. But right now they're third parties. They're not parties with respect to the Reilly-Tarr consent decree. And so they don't get to decide how that cleanup is done. So the only question is whether the entrance of the amended consent decree changes something with respect to what has been done under the consent decree in a way that harms them. And if they are concerned that at some point in the future there will be, you know, at some point in the future we will meet cessation goals and we will change the pump and treat system. If at some point in the future the fact that the pump and treat system was changed means that contamination is suddenly flowing from Reilly-Tarr to the Walker site for the first time, they would have another opportunity to vindicate those interests in a contribution action. Isn't that what they have actually alleged though? That the consent decree changes the pump and treat program in such a way that what's already flowing onto their property is going to result in an increasing flow of those chemicals and that they will be directly harmed by it. And at that point, don't they have the right to appear, present evidence, and to have that considered? Well, I think that the key is that the amended consent decree does not actually change the pump and treat system in the way that they are alleging that it changes it. You know, they're saying that there's this concern that the agencies are going to move forward with some sort of cessation of pumping, right? But the pilot project was actually run under the consent decree, not the amended consent decree. So the things that the agencies are doing with respect to testing the system, there are times when it needs to get repaired, so pumps are taken out of, you know, taken out of the system and repaired and put back in the system, that sort of thing. Those already happen under the consent decree. The pilot test project was run under the consent decree. The amended consent decree, all it says is in the future, if it turns out that we have there will be an opportunity for public comment, and then, you know, ultimately we might meet cessation criteria. And if that happens, and it turns out that there is flow, at that point in time in the future that harms pellants, they can bring an action-seeking contribution. They're arguing that somehow the process has been changed and that they've been denied the same opportunity to be heard that they currently have. Why are they wrong on that? Because they don't have an opportunity to be heard with regard to the implementation of the consent decree. They don't have the right to come in and just voice their opinion and micromanage the way that the Riley-Tarr consent decree is being run. It's being run by people who have successfully run it for 35 years in the interest of protecting public health. So, you know, they have an opportunity for public comment if it turns out that we're ready to end pumping under the consent decree, and that doesn't change with the entrance of the amended consent decree. They say there is a change in the public comment requirement. What's your response to that? I think what they're specifically saying is that the pilot test project occurred without public comment, and so ultimately that's somehow the same as the entire pumping program being ceased without public comment, and those are just different issues. The pilot test project was run under the guidance of the scientists who work on the site and said we need to evaluate whether or not this is being effective and how it's being effective. That is a very different thing than a determination that the pilot project should be ended, or sorry, the pumping treat system should be ceased, and that, which is what they're concerned about, would have an opportunity for public comment because it would be a fundamental change with regard to the amended consent decree. So with that, your honors, I want to make sure I reserve time for counsel for the city to answer any questions. So I'll just say that Judge Magnuson, again, has presided over this particular consent decree from the very beginning, so certainly to the degree that he might have been succinct in his determination that the amended consent decree was in the public interest, there's no question from the transcript and from his order that he considered all the evidence that appellants have said they would put forward and have put forward and made a determination that not only were their interests not harmed, but ultimately that the consent, the amended consent decree is protective of public health. So we ask you to affirm. Thank you. Thank you. Mr. Zoll, when you're ready, you may proceed. Thank you. It may have pleased the court. I will address the scope of the statutory contribution protections, but first I want to remind the court of St. Louis Park's role with respect to the Riley Tar Site. The city purchased the site so that it could be redeveloped. It implemented the remedy at the site for 34 years, pursuant to the terms of the 1986 consent decree, and is now stepping into the shoes of the polluting party, Riley Tar, and its successor, Vertelis Industries, to ensure that the remedy continues to be implemented for the foreseeable future, pursuant to the terms of the amended consent decree. We're not here because the city is committed to cleaning it up. Now, in reviewing the party's submissions, there seems to be little, if any, disagreement regarding the actual scope of the statutory contribution protections. The amended consent decree itself states that those contribution protections are limited to the response actions or response costs at or in connection with the Riley site. They're not a potentially responsible party. They don't have to carry out the remedy in any way, shape, or form. So it's therefore no possible claim that they could have that could be precluded by these statutory contribution protections. And both the EPA and the city agree that the amended consent decree does not affect whatever contribution claims appellants may have with respect to their own site, which would need to be separately proven and developed, put differently. Whatever contribution claims appellants had when the 1986 consent decree was in effect, they continue to have with respect to the amended consent decree. There's been no change in whatever rights they may have. And again, they have to prove those claims. They have to establish liability with respect to the 6714 site, but that's not affected by the amended consent decree. That should be sufficient. It should be sufficient, but it's not enough, apparently, for appellants. In the reply brief, they ask this court to include language in its order characterizing the investigation and remediation that has been conducted at the Riley tar site. That additional language that they propose is unnecessary. The scope of the statutory contribution protections is clear, and the proposed findings that they recommend being incorporated are prejudicial. They address issues which may be relevant to claims that they could bring at some future date regarding contribution to the cleanup of their own site at 6714 Walker Street. In those claims, those issues have not been developed or proven through contested proceedings. Has there ever been a claim for contribution made up to this point? With respect to the Walker site? There has not. To my knowledge, the work has not begun. They have evaluated the site, but the actual response work has not been undertaken, and no claim has been asserted. With that, we respectfully request that this court affirm the district Thank you. As the court noted, it must take as true the assertions by Dr. Hahn that there is a there, and that the assertion by EPA and the amended consent decree that there is no involvement of Riley tar with CVOCs has caused MPCA to reject any notion that Riley tar is responsible, thereby increasing cost to parties at 6714. That must be taken as true. With regard to the contribution protection, there is now a court order providing contribution protection that wasn't in existence under the original consent decree. The scope of that contribution protection clause has not been adjudicated. We haven't seen any court case defining the scope of that contribution protection, so respectfully, we submit that the only way to address that, we aren't trying to change their model language. All we've said is that they should stipulate that the off-site migration of contaminants is not a matter addressed or adjudicated in the Riley tar proceeding, and if this court so finds or the lower court so finds, then the contribution protection clause is wiped from the slate. That's all. We're not changing anything other than protecting our interests. We aren't asking them to stipulate to liability or anything of that sort. It's a very reasonable request, and it doesn't really impact whether we have a better claim or a worse claim. It just means that we have a claim. It's not been taken away. That's all we are asking for. With regard to what's changed with the amended consent decree critically, well, originally, solvents and degreasers were to be a chemical substance addressed, and as we can see, they did test for CVOCs, and in 2016, they noted the presence of a plume and said the pump and treat system has to be optimized to deal with it. The pump and treat system has been shut off. It's been shut off for what they call the pilot cessation program. Show me where in the original consent decree there is such a thing as a pilot cessation program. It's not there. That doesn't have anything to do with the amended decree, does it? The amended decree provides for the pilot cessation program. But they did it on the original decree. Well, there's no original decree calling for a pilot cessation program. The original decree, I think what they're doing is rubber stamping it after the fact, Your Honor, because there is no, under the original consent decree, the only thing they could do is prove there's not a source, there's not migration, change the wrap, the remedial action plan, provide for public notice where we would get a chance to at least comment, and then move on. But they used this pilot cessation program, and it's been turned off for four years. And note that the City of St. Louis Park, again, in their website is saying that's no longer the CD wrap, accepting use of modern drinking water criteria, switching from groundwater pumping to monitored natural attenuation. That's the way they're reading the amended consent decree. That's the way we're reading it. There's been a change, it's been a fundamental change, and it's hurting our interest. The final issue I just want to briefly talk about is whether the lower court determined that somehow EPA and St. Louis Park are protecting adequately our interest. Clearly we respect the EPA and certainly the St. Louis Park, but here we're diametrically opposed. We're on opposite ends of this issue. Due process requires that we each get to present our case to the lower court, and that the court make a determination, particularly where there's financial harm that's being asserted. Certainly EPA and St. Louis Park aren't looking out for financial interest of the interveners and appellants. So we respectfully ask again that this court reverse the lower court's determination and remand. If there's no further questions, I'll depart and thank you. Thank you. Matter is taken under advisement. I want to thank you for the fine briefing and the fine argument that was received here today. We'll rule on this as soon as practicable. Whatever that means, right?